**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MELANIE LOCKHART,**

        **Plaintiff,**

   **v.**                         **Civil Action 2:19-cv-2935**
                                         **Magistrate Judge Jolson**

**MARIETTA CITY SCHOOLS, et al.,**

        **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Doc. 11), is before the Court on Defendants William Hampton's and Marietta City School's Motion for Summary Judgment (Doc. 34) and Motion for Leave to File Supplemental Reply (Doc. 67). For the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 34) is **GRANTED**. Defendants' Motion for Leave to File Supplemental Reply (Doc. 67) is **DENIED**.

**I.**      **BACKGROUND**

Plaintiff Melanie Lockhart is a former middle school physical education teacher for the Marietta City School District ("the District"). Plaintiff worked for the District for nearly twenty years before she was terminated in February 2019. (*See* Doc. 48 at 12:4–23). The events leading to her termination began roughly a year earlier, on Saturday, January 13, 2018, while she shoveled snow for her neighbor.

**A.  January 13, 2018: The Shoveling Incident**

While shoveling snow on the morning of January 13, 2018, Plaintiff believes she lost control of her body, and a "supernatural power" lifted her and moved her roughly ten feet away.

(*Id.*, 22:1–24:14).  Months later, at her deposition, she elaborated:

> I was going down a tunnel and–or a well, and I said, "I'm not afraid to die.  I just want to know is it going to hurt?" . . . And I kept falling faster and faster.  And I just said "Oh dear Lord.  Please save me." . . . I thought—that's what I thought was going to happen.  And I fell through a red eye.  I went through an eye and it exploded.  And that's when all of a sudden the light, whiteness came to.  I can't remember everything in terms of order.  But the darkness and the—the—the—the bars had me to the ground.  They had me pinned.  And it hurt so bad.  I just kept saying, "Oh dear Lord.  It hurts."  And eventually I could finally move.  I couldn't move.  It was like one bar lifting at a time. . . .

(*Id.*, 25:12–26:6).  Plaintiff's three children eventually found her.  (*Id.*, 27:25–28:7).  Plaintiff believes the "spirit of the Lord" "healed" her that morning and saved her from damnation.  (*Id.*, 30:15–31:8).  The following Monday through Thursday were snow days, so Plaintiff did not return to work until Friday, January 19.  (*Id.*, 31:13–19).

**B.  January 19–23, 2018: Return to Work**

Back at school, Plaintiff eagerly shared her experience with students and staff.  She told her entire class about it, (*id.*, 47:5–12), and sought out Principal Brittany Schob to share her story, (*id.*, 50:25–51:12; Doc. 51, 25:4–21).  Principal Schob later testified that Plaintiff "said that since [her experience] her pain had gone away, and the only way that she could keep her pain away was if she continued to tell people about her episode."  (Doc. 51, 25:18–21).  Throughout the day, Plaintiff continued to describe her experience for students and staff, keeping a group of eighth grade students late after class.  (*Id.*, 28:20–29:1).  Principal Schob did not discipline or otherwise warn Plaintiff regarding her conduct at that time.  (Doc. 51, 31:1–3).

Plaintiff's discussions with students extended beyond school hours.  That evening and over the weekend, she exchanged emails with two students who said they were interested in learning more about Plaintiff's experience.  (*Id.*, 52:21–53:1).  One student told Plaintiff that her "story really moved" her, and she "feel[s] like [she] is the person [Plaintiff] [was] talking about[.]" (Doc. 41).  Plaintiff responded:

2

I am so moved that I touched you and if you wonder if I am talking about you, then chances are that I am.  He does not tell me who, he only tells me what to say so that person will know he is talking to them.  I will say I locked eyes and was drawn to several students in the group.  I did not know why he was drawing me to lock in on them, but I know now.  Of the students I kept being drawn too [sic], 5 of you have spoke [sic] to me.  How freaky is that!  Yes I have cried with understanding as to why he is using me to tell my story.  I had visions last night from him and I did not fully understand until I opened my email this morning.  My work is not done and I can not tell you if I will give you the answers you are seeking bit [sic] looking forward to our meeting.

I had a vision that I will be flooded with students seeking me out next week.  Even students that was [sic] not in the group.  I do not know if this vision is correct but I believe it is as I was told to go and tell Mrs. Schob what has happen [sic] with me and what was going to happen so she would understand why students will be asking teachers to come talk with me.  I am not sure of [sic] I am ready for what is to come, but knowing I will be able to handle it makes the process easier.  Thank you for reaching out to me and wanting to listen to what I was to tell you.  He has given me a gift and I feel so blessed that he has chosen me.  Hope you are enjoying this beautiful day.

Mrs. L

(*Id.*).

Another student wrote to Plaintiff, telling her she "sparked something in several of [her] students," and was "inspired" by Plaintiff "allowing god to use [her] to speak to others."  (Doc. 42).  Plaintiff wrote back:

I must say WOW.  I need you to know that your words are spoken well and he is VERY PROUD of you.  As we were in the group, he had me drawn to a few students in that group.  YOU being the first.  I was not sure why I was drawn to you but I know now.  He was very pleased to see you light up and eager to listen as I began to talk.  He knew you understood from your beautiful smile.  Of the students that I was drawn to, 5 of you have spoken to me.  There is one left.  I do not know if the person that you are speaking of is the other person that I was drawn to.  May I ask if it was a boy or a girl?  If it was a boy, I believe I know who it was.  You pleased him with your actions of seeking out and talking to that student.  He wants you to know that you did NOT sound foolish!!  He wants you to know that he is speaking through you to them.  That is why he allows me to tell people that I may sound crazy when I start to talk.  He wants me to assure them that I know it is not normal to be able to say things that I do not know personally, yet I tell them what they are feeling, doubting or fearing.

He has showed me visions of me touching students [sic] lives, several lives at that.  He showed me that I am going to have students ask to come and see me.

Yes, even students that was [sic] not even in the group. . .

(*Id.*).

On Monday, January 22, a concerned parent told Principal Schob that Plaintiff had a troubling conversation with her daughter regarding Plaintiff's visions. (Doc. 51, 31:16–32:24). Principal Schob cautioned Plaintiff that morning, telling her to be careful and suggesting after-school programs where she could more appropriately discuss her beliefs. (*Id.*, 33:18–35:2). At her deposition, Principal Schob testified that, during this exchange, Plaintiff said, "she could feel what was happening inside of me, and my thoughts, and she put her hand on my hand, so she asked to hold my hand during that time so she could feel what I was feeling." (*Id.*, 34:12–16).

Principal Schob grew more concerned. And that evening, when she attended a Marietta Board of Education ("Board") meeting, she asked the District's Superintendent, William Hampton, if they could meet. (*Id.*, 39:5–9; *see also* Doc. 50 at 41:14–42:6). The two met the next morning and discussed Plaintiff's recent behavior. (Doc. 51, 39:24–40: 1). Superintendent Hampton instructed Principal Schob to keep him updated while he considered next steps. (*Id.*, 40:13–43:5).

Principal Schob and Assistant Principal Tim Fleming then met with Plaintiff. (*Id.*, 44:10– 12). Despite their concerns and warnings, Plaintiff told them not to worry and that the school would make "national news," a statement Principal Schob and Assistant Principal Fleming both found alarming. (*Id.*, 44:13–22; Doc. 48, 77:13–16). Principal Schob immediately called Superintendent Hampton, who held a meeting with District administrators and Plaintiff that afternoon. (Doc. 51, 45:18–24).

At the meeting, Plaintiff appeared "excited" to share her experience and "kept repeating that she was going to make national news, that we were going to go to court," and "that we would all be there." (*Id.*, 58:13–25). Principal Schob later testified that she was concerned about Plaintiff's "state of mind," (*id.*, 59:20–21), and Superintendent Hampton described the meeting as "bizarre," (Doc. 50, 58:25). School administrators questioned Plaintiff about any medications or

4

drug use, and Plaintiff said she smoked marijuana in June 2017 and used CBD oil for pain relief. (Doc. 51, 59:24–63:7).

After meeting for roughly two hours, Superintendent Hampton placed Plaintiff on paid administrative leave. (*Id*., 64:2–6). He handed her an official letter to that effect, which provided in relevant part:

> During this period of leave . . . You are not to communicate by any means, or through any other person, with the students of the Marietta City Schools or their parents/families regarding your employment. You must not engage in any communications with other Marietta City School District employees on matters related to your employment, this investigation, or this leave; except that, you may communicate with union representatives. If you violate this directive, it will constitute insubordination and may result in disciplinary action up to and including termination of your employment.

(Doc. 50-10).

### C. January 24, 2018: Police Report and Subsequent Events

The next day, January 24, Principal Schob and Superintendent Hampton received a call from the Washington County Sheriff's Office. (*Id*., 86:11–21). Apparently, a concerned citizen contacted law enforcement about one of Plaintiff's recent Facebook posts, which stated:

> I NEED you ALL, to know that you will be seeing and hear [sic] some things about me in the NEAR future. I may sound crazy but I need you to believe in me. You will JUDGE and you will say you don't believe. I need you to see this as I know what it is about to happen will be in the National News. DO NOT WORRY ABOUT ME I AM NOT SCARED! You will learn things about me that I am ok with you knowing. Again, DO NOT JUDGE ME. I can NOT and will NOT be able to speak to any of my colleagues or students about this no matter of [sic] our relationship and you are not to contact me as I can NOT respond! I can NOT and will NOT use FB to communicate to the rest of you. I need you ALL to believe in me. This is going to be the BEST RIDE of my life !!! I am so excited for this and you will all understand when its [sic] over.
>
> I NEED everyone to share this. I NEED people to see my face and learn my name. Share share share. I ASK that you do it for me.
>
> I know several of you will contact my family about what is going on[.] They will know what to tell you and I believe in them. I NEED to leave you with this

> I HEAR I FORGET
> I SEE I REMEMBER
> I DO I UNDERSTAND
> I LOVE YOU ALL!!!!

(Doc. 44).  Because of the post, police officers were dispatched to Plaintiff's house in West Virginia for a wellness check.  (Doc. 34-1).  They concluded she was not a threat to herself or others and was not under the influence of drugs or alcohol.  (*Id.*).

Roughly one week later, on February 3, Plaintiff wrote to Superintendent Hampton, asking for the specific charges against her.  (Doc. 50-13).  Superintendent Hampton responded that the District had "not yet completed all that needs to be done with regard to any charges/allegations," but that he would do so following the investigation.  (*Id.*).  He also promised to provide Plaintiff with "a date/time for a meeting to discuss the allegations (i.e., your opportunity to be heard)." (*Id.*).

### D.  February 8–March 6, 2018: Mental Health Evaluations

In early February, the District hired licensed psychologist Fred Lee to evaluate Plaintiff and determine her fitness for duty.  On February 8, Superintendent Hampton sent Mr. Lee's office a letter describing Plaintiff's recent conduct and attaching a summary of events prepared by Principal Schob.  (Doc. 50-14).  In the meantime, Plaintiff arranged for her own psychological evaluation with supervised psychologist Amber Davis.  (Doc. 60-1).

Plaintiff attended her evaluation with Ms. Davis first, on February 16, 2018.  (*Id.*). Following several tests, Ms. Davis concluded:

> . . . According to her profile, Ms. Lockhart is likely unwilling to engage in self-examination of her role in difficult life situations, and may react erratically if pushed to do so.  . . .
> Ms. Lockhart exhibits a forceful and driven energy level.  Her profile indicates a high level of emotional excitability and zealousness, and a tendency to present in a highly animated and sometimes quick-tempered manner.  Her driven nature does not necessarily result in effective achievements and she may become

6

obstinate, inappropriate, and caustic as a result.

Ms. Lockhart displays an infectious enthusiasm and ability to dispel tension in social situations. However, her exuberance can become intrusive and overbearing.

. . . Ms. Lockhart's profile indicates that she has a preoccupation with grandiose fantasies. She is inclined to exaggerate her power, perceive failures as successes, and construct intricate and lengthy rationalizations. Further, she is likely to deprecate those who do not accept or promote her superior self-image.

(*Id*.).

Ultimately, Ms. Davis diagnosed Plaintiff with unspecified disorder of adult personality and behavior; other psychiatric disorder not due to a substance or known physiological condition; risk of bipolar disorder, current episode manic severe with psychotic features; and risk of schizophrenia, unspecified. (*Id*.). Ms. Davis further opined that, with treatment, including medication management and psychotherapy, Plaintiff had a "fair" prognosis. (*Id*.).

On February 22, Plaintiff attended her evaluation with Mr. Lee. (Doc. 34-2 at 9–10). Mr. Lee issued his initial report on February 26. (*Id*.). In his report, Mr. Lee noted Plaintiff's "willingness to be cooperative" during the examination. (Doc. 50-17). He noted she "would benefit from a psychiatric review and medication regimen and monitoring." (*Id*.). Superintendent Hampton promptly followed up, requesting Mr. Lee's specific opinion as to whether Plaintiff could perform the essential functions of her job. (Doc. 50, 102:15–25; *see also* Doc. 50-18). Mr. Lee issued a second report on March 6 with his opinion regarding Plaintiff's ability to return to work. (Doc. 34-2).

In this subsequent report, Mr. Lee elaborated on the results of various tests performed during Plaintiff's evaluation:

. . . Her Rorschach shows a serious impairment to think logically and coherently with her being less able than most people to reach reasonable conclusions about the interrelationships among events and of maintaining an associated flow of thought so that one idea follows another in an understandable fashion. Similarly, her reality testing is awry with her prone to misinterpret events and to arrive at erroneous notions about people and the significance of their actions.

7

This is a significant liability that is likely to result in her often failing to foresee the consequences of her actions. Her inaccurate interpretations of people and events are apt to lead to poor judgments and ill-advised conduct. Many individuals with her degree of impaired reality testing have trouble managing even living without a degree of supervision and often meet criteria for a psychotic degree of disturbance. . . .

    . . . Other aspects of her Rorschach responses reveal a Pollyanna kind of denial aimed at keeping oneself in good spirits by warding off and refusing to acknowledge the existence of darker or more critical dispositions. Such contrived avoidance and flight into more grandiose imaginings constitutes a fragile defensiveness. Further, she experiences herself as having been chosen by an inner voice which she attributes to God for a special mission involving the reaching out to those who have been traumatized by abusive treatment. She is being directed in this ambition by her voice which has not only healed her but is guiding her in this objective and prophesying an expanding outreach that will ultimately capture national attention. It is further the case that her voice has informed her that if she deviates from its mandates her healing will evaporate so she is operating under an inner compulsion that is unchecked by an overriding rationality. Diagnostically she exhibits a Bipolar I Disorder, Manic Type with Psychotic features.

(Doc. 34-2). Ultimately, Mr. Lee concluded that he did "not regard [Plaintiff] as capable of performing the essential functions of her current position as teacher and within the legal and ethical boundaries of Marietta City Schools and her profession." (*Id*.).

### E.  March 20, 2018: Initial Pre-Disciplinary Meeting

On March 20, 2018, Plaintiff attended a pre-disciplinary meeting. At the meeting, the District raised four allegations against her:

1.  admitted and recent use of marijuana;

2.  using your position as a teacher for [the District] to discuss, share, and teach about your religion/your religious beliefs with students and others during the student instructional day;

3.  [e]ven though you are aware that you are not to discuss your religious beliefs, experiences, etc. at school and with students, you affirmatively stated that you no longer have control over what you say (indicating that God tells you what to say and to whom); and

4.  Mr. Lee's professional opinion that you are not capable of working as a teacher.

8

(Doc. 50-22).

Plaintiff disputed the District's allegation that she smoked marijuana "recently," clarifying that she smoked marijuana only once in June 2017, and that she used legal CBD oil for pain relief. (Doc. 50, 112:14–113:6). According to Principal Schob's notes from this meeting, Plaintiff also explained that she emailed only with students who were interested in learning more about her religious experience and only outside of school hours. (*See* Doc. 51-2).

### F. March 2018: Social Media Communications with Students

While on paid administrative leave, Plaintiff, despite the District's clear instructions, communicated with several students over private Facebook messages. (*See* Docs. 45, 46). After her initial pre-disciplinary meeting, she messaged one of her students:

> Hey beautiful. I hope you are doing well. I am doing great!! So sorry I abandoned you and the other students. I was forced to leave. Do not trust Mrs. Schob, Mr. Fleming and even Mr. Benson. My heart aches for them and what they have done that has not been right with removing me from the school. There is so much to this. They along with the Superintendent have lied about things and I have proof. They don't understand my gift and what I know. . . . Please do not ask or talk to any of them about this until after Monday evening. . . .

(Doc. 46 at 41).

Around the same time, Plaintiff sent a similar message to another student:

> Morning beautiful! I need you to know I am not angry at you. You have NOT done anything wrong. I love you. I know your heart is filled with sadness and you think you let me down. You did everything RIGHT. What zi [sic] do need is your mom to call me ASAP. Your mom has a law suit against the school for what they just did to you. [redacted]. They violated your rights and did it all wrong according to the law. She needs to call me now!!! This is very important, listen to your heart and trust me. I told you that Mrs. Schob, and Ms. Fleming could not be trusted. This was all in his plan, believe me. . . .
>
> I want you to enjoy your trip and remember, they (schob, fleming, hamton [sic]) told you when they pulled you [to] the office after school hours, to let them know

9

if I contacted you.  They may [sic] even threatened you or tried to make you think I brainwashed you.  You, me and God know what happened when I told my story . . .

You do not have to do as they tell you.  This is bullying at its finest.  You are a victim.  There is so much to all of this and you are only hearing their side of the story, what they want you to hear.  DO NOT BE AFRAID TO STAND UP FOR YOURSELF.  Do not tell anyone that I contacted you.  They will go behind your back and tell again because they think they can trust them.  Trust me, IAM [sic] THE ONE YOU NEED TO TRUST.  Please just enjoy the rest of your trip and just put this behind you until you get home.  I dearly love you.  Have they told you that they love you?  Know that Mrs. Lockhart does.

(*Id*. at 11–20).

Plaintiff also told a student that her visions allow her to solve murder cases and offered to talk to and receive "visions" from that student's uncle, who she believes "was set up" for a crime. (*Id*. at 23).  She asked another student to "do [her] a favor" "on the down low" and "try to get as many students and parents" to show their support for her and attend the upcoming Board meeting. (Doc. 45).  In asking for this favor, Plaintiff referenced that student's prior detentions, saying she knew what it was like to be "falsely accused of something."  (*Id*.).

### G. April 5, 2018: Second Pre-Disciplinary Meeting

Following her initial pre-disciplinary meeting, Plaintiff received notice of a second one, which took place on April 5.  (Doc. 50-24).  This notice added several new allegations against Plaintiff:

1. On or about January 23, 2018, you were placed on paid administrative leave pending an investigation into allegations of misconduct.  The letter expressly advised you that, among other things, "you are not to communicate by any means, or through any other person, with the students of the Marietta City Schools or their parents/families regarding your employment."  Beginning [on] or about Saturday, March 24, 2018, and continuing thereafter, you communicated by text message with a student of Marietta schools about your employment and various other issues related to your employment.

2. It is also believed that you have been in contact with other students of Marietta

10

Schools about your employment and related matters.

3. Given your persistent refusal to comply with the directives given to you, there may be additional evidence of the foregoing misconduct and/or additional allegations of misconduct that arise between now and the time of the meeting. If so, these allegations and evidence will be presented to you.

(*Id.*).  The notice further informed Plaintiff, "[b]ased upon the information presented at the meeting . . . a recommendation may be made to the Board following the meeting to take disciplinary action, up to and including termination of your employment." (*Id.*).

Plaintiff appeared at the April 5 Board meeting with legal counsel.  She read from a prepared statement, asserting: (1) the District discriminated against her based on her disability; (2) the District was required to accommodate her; and (3) Superintendent Hampton inappropriately disclosed her private medical information.  (Doc. 50-26).  She asked the Board to "table this resolution" pending "an investigation by the board members to determine Mr. Hampton's Unethical Code of Professional Conduct." (*Id.*).  She went on to say, "[i]f you vote on a resolution of termination, he [Superintendent Hampton] is just involving you in the litigation because you are now aware of the violations that has [sic] occurred against me and not trying to protect me or yourselves as the BOE." (*Id.*).

After the meeting, Superintendent Hampton recommended to the Board that Plaintiff be terminated.  (Doc. 34-5).  Plaintiff received notice of this decision, as well as a brief summary of the allegations against her:

These allegations, which were set forth in the pre-disciplinary meeting notices provided to you, involved your admission to the illegal use of marijuana, your misconduct in using your position as a teacher for the Marietta City Schools to discuss, share, and teach about your religion/your religious beliefs with students and others during the instructional day and at other times, and your defiance of the directive not to communicate with students of Marietta Schools about your employment and related matters while you were on paid administrative leave (both

> before and after you were issued the second pre-disciplinary meeting notice). In addition, Dr. F. Lee conducted a fitness for duty examination on February 22, 2018, and found that you are not fit for duty.

(*Id.*).

The Board then voted to accept Superintendent Hampton's recommendation to proceed with termination proceedings against Plaintiff and to suspend her without pay. (Doc. 50, 131:12–15; *see also* Doc. 50-27 (Board meeting minutes)).

### H. December 4, 2018: Administrative Hearing

Upon receiving notice of the Board's decision, Plaintiff requested a public hearing before a referee. The District scheduled the hearing for May 4, 2018, but for unspecified reasons, later rescheduled it for December 4, 2018. (Doc. 47, 119:21–120:4). At the hearing, David Hipp served as the referee, and numerous administrators, including Principal Schob and Superintendent Hampton, testified. (*See generally* Doc. 47). Plaintiff also testified, along with several witnesses on her behalf, including the police officer who conducted her wellness check and her husband. (*See id.*).

When asked to clarify her earlier statements regarding the school making "national news," Plaintiff testified:

> I didn't know yet at the time. But what I meant was, we were going to be in the news, we were to be in the paper, we were going to be on television, and it's going to spread like wildfire throughout the United States. That's what–in terms of–of what was happening.

(*Id.*, 200:16–22).

She also testified that she smoked marijuana "on [her] personal time in the summer" to help with back pain. (*Id.*, 206:3–13).

And she recounted how she shared her religious experience with students:

Q. Did you ever use your position as a teacher to discuss sharing and teaching religion and religious beliefs?

A. No.  I told my story.

Q. Did you say you no longer have control over what you have to say?

A. At that time, yes, I was just learning what was going on and how to control it. At that time, I said yes.  But as of now I understand everything.  I can control.  I know exactly what's being told of me, and I understand everything.

(*Id.*, 222:8–18).

Plaintiff then testified that she "ha[s] to follow his orders to remain pain-free," (*id.*, 258:19– 20), but that she was in control of her thoughts and actions and was capable of teaching students, (*id.*, 265:16–20).  Following post-hearing briefing, Referee Hipp issued a Report and Recommendation ("R&R") that Plaintiff's teaching contract be terminated.  (*See* Doc. 50-29).

### I.  February 25, 2019: Board Meeting

On February 25, 2019, the Board unanimously voted to adopt a resolution to accept Referee Hipp's R&R.  (*Id.*).  The District officially terminated Plaintiff on February 27, 2019.  (*Id.* at 1).

### J.  Post-Termination

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in the spring of 2019, which then issued a Right to Sue Letter.  (Doc. 65). Beginning in the new year, in January 2019, Plaintiff began substitute teaching for two other school districts until they closed in March 2020, due to the COVID-19 pandemic.  (Doc. 48, 9:2–10:20).

\* \* \*

Plaintiff filed this lawsuit in July 2019 for disability and religious discrimination, as well as retaliation.  (Doc. 1).  Defendants moved for summary judgment on September 4, 2020.  (Docs. 1, 34).  The matter is fully briefed and ripe for resolution.

13

## II.    STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (defining "genuine" as more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.    DISCUSSION

Broadly speaking, this case is about Plaintiff's termination.  But Plaintiff's precise claims are not entirely clear.  In her Complaint, she sets forth claims for disability discrimination under both federal and Ohio law, (Counts One and Two), as well as for religious discrimination and retaliation in violation of Ohio law (Counts Three and Four).  Defendants move for summary judgment on each.  (*See generally* Doc. 34).  Yet Plaintiff also seems to allege that Defendants failed to accommodate her disability, (*see* Doc. 1, ¶ 42), even though that claim is not clearly brought.  But, importantly, the parties make arguments regarding the claim; therefore, the Court considers it, too.  (*See generally* Docs. 34, 54, 60).

14

### A. Disability Discrimination (Counts One and Two)

Plaintiff's state and federal disability discrimination claims rise and fall together. Ohio's law governing claims for disability discrimination "parallels" the federal Americans with Disabilities Act ("ADA") "in all relevant respects[.]" *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (quotation marks and citation omitted). So the Court applies federal law to these claims. *See id.* (quotation marks, citations, and alteration omitted) ("[T]his court applies the same analytical framework, using cases and regulations interpreting the ADA as guidance in our interpretation of Ohio Rev. Code § 4112.02.").

The ADA "prohibits discrimination against a 'qualified individual' on the basis of disability." *Conley v. Lakota Local Sch. Dist.*, No. 1:16-CV-01105, 2017 WL 978545, at *2 (S.D. Ohio Mar. 14, 2017) (internal quotation marks omitted) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Because direct evidence of discrimination in the workplace is rare, the Court applies a burden-shifting framework to Plaintiff's claims. *Belasco*, 634 F. App'x at 517 (citing *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012)).

Under this framework, Plaintiff bears the initial burden to establish her prima facie case. She must demonstrate (1) she was disabled at the time of the adverse employment action; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open. *Belasco*, 634 F. App'x at 517 (citing *Rosebrough*, 690 F.3d at 431). Plaintiff's burden "in establishing a prima facie case is not onerous and is easily met." *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019).

If Plaintiff establishes her prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for terminating her. *Belasco*, 634 F. App'x at 517 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Jones v. Potter*, 488 F.3d 397,

404 (6th Cir. 2007)). If Defendants do so, the burden returns to Plaintiff to prove by a preponderance of the evidence that Defendants' "proffered reason[s] w[ere] in fact a pretext designed to mask illegal discrimination." *Belasco*, 634 F. App'x at 517 (quotation marks and citations omitted).

    *1. Prima Facie Case*

    Defendants challenge only one element of Plaintiff's prima facie case—her qualifying disability. "Under the ADA, 'disability means either (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded by one's employer as having such an impairment" even, if in fact, you are not disabled. *Chaniott v. DCI Donor Servs., Inc.*, No. 3:19-CV-00222, 2020 WL 4937515, at *5 (M.D. Tenn. Aug. 24, 2020) (quoting 42 U.S.C. § 12102(1)).

    Defendants' argument is simple: Plaintiff does not believe she was or is disabled, so how can she claim Defendants discriminated against her on the basis of her disability? (Doc. 34 at 22– 23). But that is not the standard. Plaintiff must simply produce "evidence from which a jury could find that" she had a disability when she was terminated. *Corbett v. Harvey*, No. 2:06-CV-761, 2008 WL 731487, at *10 (S.D. Ohio Mar. 17, 2008). And the Court does not stringently test that evidence. *See Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018).

    Indeed, "[h]aving concluded that the courts were defining 'disability' too narrowly, Congress amended the ADA in 2008 to state that the term should be construed in favor of broad coverage, to the maximum extent permitted by the ADA's terms." *Id*. (alterations, quotation marks, and citations omitted). Relevant here, "Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be permanent or long-term to qualify as a disability under the ADA." *Id*. (quotation marks and citations omitted). "Congress also cautioned that the question of whether an individual's impairment is a disability should not demand extensive analysis." *Id*. (ellipses, quotation marks, and citation omitted).

Plaintiff has met her burden here. There are two medical reports in the record, which were issued within several months of the Board's decision to initiate termination proceedings against her. Both reports concluded that Plaintiff suffered from serious psychological issues. As noted, Mr. Lee concluded that, "[d]iagnostically [Plaintiff] exhibits a Bipolar I Disorder, Manic Type with Psychotic features." (Doc. 34-2 at 7). Crucially, he found she was not "capable of performing the essential functions of her current position as [a] teacher[.]" (*Id*.). Similarly, Ms. Davis noted the following diagnoses: unspecified disorder of adult personality and behavior; other psychotic disorder not due to a substance or known physiological condition; risk of Bipolar Disorder, current episode manic severe with psychotic features; and risk of Schizophrenia, unspecified. (Doc. 60-1 at 4).

Based on this evidence, a reasonable jury could conclude Plaintiff was disabled when Defendants terminated her. *See, e.g.*, *Chaniott*, 2020 WL 4937515, at *5 (emphasis omitted) (holding that plaintiff satisfied his prima facie case where there was "a great deal of evidence in the record that [he] suffered from mental health symptoms"). And since Defendants challenge only that element of Plaintiff's prima facie case, the burden now shifts to them, to offer a legitimate, nondiscriminatory reason for terminating Plaintiff. *See, e.g.*, *Moates v. Hamilton Cty.*, 976 F. Supp. 2d 984, 991 (E.D. Tenn. 2013) (addressing only the disputed elements of plaintiff's prima facie case).

### 2. *Legitimate, Nondiscriminatory Reasons*

An employer's burden to set forth one or more legitimate, nondiscriminatory reasons for terminating an employee is one of production, not persuasion. *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). It must "'simply explain[] what [they] ha[ve] done or produce[] evidence of legitimate nondiscriminatory reasons.'" *Tri-Cities Holdings LLC v. Tenn. Health Servs. & Dev. Agency*, No. 2:13-CV-305, 2017 WL 3687846, at *15 (E.D. Tenn. Aug. 25, 2017), *aff'd sub nom. Tri-Cities Holdings LLC v. Tenn. Admin. Procedures Div.*, 726 F. App'x 298 (6th

17

Cir. 2018) (internal quotation marks omitted) (quoting *Burdine*, 450 U.S. at 256). An employer's burden is slightly higher, however, if it terminated an employee for conduct potentially caused by the employee's disability, as is the case here. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739 (6th Cir. 2015).

Defendants say they terminated Plaintiff for four reasons. Notably, they are the same as those set forth at the Board's April 5, 2018, meeting. They include: (1) Plaintiff's illegal use of marijuana; (2) Plaintiff's use of her position as a teacher to discuss, share, and teach students about her religious beliefs; (3) Plaintiff's disobedience of instructions not to discuss her religious beliefs or ongoing termination proceedings with others, namely students; and (4) Plaintiff's inability to perform the essential functions of her job as a teacher. (Doc. 34 at 25–31). There is no evidence to suggest that Plaintiff's use of marijuana stemmed from her mental health disability. But the same is not true regarding Plaintiff's other conduct. The Court, accordingly, applies a different standard to Defendants' latter three explanations.

     i.     Non-Disability Related Conduct

Because Plaintiff's marijuana use is unrelated to her disability, Defendants' burden concerning Plaintiff's use of marijuana is straightforward. They simply must "'explain[] what [they] ha[ve] done or produce[] evidence of legitimate nondiscriminatory reasons.'" *Tri-Cities Holdings*, 2017 WL 3687846, at *15 (internal quotation marks omitted) (quoting *Burdine*, 450 U.S. at 256). It is undisputed that Plaintiff smoked marijuana while working as a teacher. She testified at her deposition that she "smoked [marijuana] a couple times," (Doc. 48, 38:3–13), and testified at her public hearing that she smoked marijuana "on [her] personal time," (Doc. 47, 204: 7–10).

18

Defendants explain that not only is the recreational use of marijuana illegal in Ohio, but Plaintiff, as a role model to middle school students, could "creat[e] an appearance that such activity is acceptable." (Doc. 34 at 27). Defendants' explanation constitutes a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Adkins v. Excel Mining, LLC*, 214 F. Supp. 3d 617, 624 (E.D. Ky. 2016) (noting that "[t]he violation of a company drug or alcohol policy is a legitimate, nondiscriminatory reason for firing an employee"); *EEOC v. Pines of Clarkston*, No. 13-CV-14076, 2015 WL 1951945, at *5 (E.D. Mich. Apr. 29, 2015) (noting that "discharge for illegal drug use is a permissible nondiscriminatory reason").

Again, Defendants need not persuade the Court that they terminated Plaintiff because of her marijuana use. *Tri-Cities Holdings*, 2017 WL 3687846, at *15. Indeed, the Court can make "'no credibility assessment'" as to this proffered reason. *Martin v. Huron Valley Ambulance, Inc.*, 226 F. Supp. 3d 871, 884 (E.D. Mich. 2016) (internal quotation marks omitted) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000)). Rather, because Defendants produced evidence supporting this proffered reason, they have met their burden. *See Tri-Cities Holdings*, 2017 WL 3687846, at *15.

ii.     Disability-Related Conduct

Turning to Plaintiff's remaining conduct, communicating with students about her religious experience and employment proceedings, there is evidence that this conduct stemmed from her disability. But that does not mean that Defendants' hands were tied. "[T]he ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability." *Yarberry*, 625 F. App'x at 739 (quotation marks and citation omitted). "Employers not only have latitude to discipline employees for threats of violence, stealing, or destruction of property, but also may prohibit inappropriate behavior between co-workers, [or] prohibit employees from sending inappropriate or offensive emails[.]" *Id*. In other words, "[h]aving a disability does not insulate an individual from adverse employment action." *Sullivan*

19

*v. River Valley Sch. Dist.*, 20 F. Supp. 2d 1120, 1127 (W.D. Mich. 1998), *aff'd*, 197 F.3d 804 (6th Cir. 1999).

Here, Defendants sought to enforce policies prohibiting teachers from sharing their religious beliefs and engaging in inappropriate communications with students, especially when explicitly instructed not to do so. (*See generally* Doc. 34). And Defendants were free to enforce these policies "as long as [they] are job-related and consistent with a business necessity." *Yarberry*, 625 F. App'x at 739. This includes all policies, even those "not found in workplace policies, employee handbooks or other such documents[.]" *Id*.

The Sixth Circuit's decision in *Yarberry v. Gregg Appliances* provides guidance here. In *Yarberry*, the plaintiff, an appliance sales manager at an Hhgregg store, was terminated after experiencing a manic episode in which he broke into the store after-hours. 625 F. App'x at 731–34. The store's surveillance footage showed him "locking himself in the building, going to the safe in the manager's office, placing a box inside and closing it[,] wander[ing] around the store and play[ing] on the computers for several hours." *Id*. at 731. Shortly thereafter, he was involuntarily committed to a psychiatric hospital and diagnosed with Bipolar Disorder. *Id*. at 733–34.

Hhgregg terminated the plaintiff for his conduct, citing a violation of store safety and security policies, as well as general behavior standards for management. *Id*. at 740. But according to the plaintiff, because his "behavior directly stemm[ed] from his bipolar disorder," Hhgregg could not terminate him. *Id*. at 738. Not so, said the Court. Hhgregg could properly terminate the plaintiff for his conduct as long as its reasons for doing so were job-related and consistent with business necessity. *Id*. at 740. To make that finding, the Court considered five relevant factors:

(a) the manifestation or symptoms of a disability affecting an employee's conduct;

(b) the frequency of occurrences;

(c) the nature of the job;

(d) the specific conduct at issue; and

(e) the working environment.

*Id*. at 740.

The facts of *Yarberry* presented the Court with a "close case." *Id*. On one hand, "the manic episode apparently associated with [plaintiff's] bipolar disorder that caused him to enter a Hhgregg store after hours was non-violent and occurred only once." *Id*. Given that, the Court was "concern[ed] with "Hhgregg's decision to terminate a previously successful employee so quickly after such an isolated event[.]" *Id*. On the other hand, the plaintiff's "behavior in entering a store after hours, opening the safe, roaming around the store and using store equipment, and then leaving the store without setting the alarm, all gave Hhgregg grounds for terminating him for his conduct alone[.]" *Id*. "In light of these specific facts, Hhgregg had legitimate, nondiscriminatory reasons for the termination." *Id*.

This case is less close than *Yarberry* was. Plaintiff's conduct was not isolated to one incident. Nor did it involve only her. To the contrary, Plaintiff discussed her religious experience and ongoing suspension and termination proceedings with her students multiple times. Before her administrative leave, she exchanged emails with at least two students. (*See* Docs. 41, 42). And once placed on administrative leave, Plaintiff received direct instructions not to communicate with students. (Doc. 50-1). Yet, her communications continued. She told one student her visions could help defend her uncle in a lawsuit. (Doc. 46 at 23). And she repeatedly told students that school administrators were lying to them—and warned students to keep school administrators in the dark about their contact. (*See* Docs. 45, 46).

Considering each *Yarberry* factor, the Court concludes that Defendants terminated Plaintiff for reasons that were job-related and consistent with business necessity. Beginning with the first two factors, the manifestation of her symptoms and the frequency of her conduct, Plaintiff's symptoms manifested quickly, and she displayed an utter disregard for the District's rules. Even

21

more troubling is the substance of her communications with students. They establish Plaintiff did not intend to follow the District's rules or work with school administrators to save her job. Far from it, she frequently sent inappropriate private Facebook messages and emails urging students to distrust and disobey their teachers and principal.

The final three factors—the nature of her job, the specific conduct at issue, and the working environment—are, in the Court's view, the most significant. Plaintiff's conduct impacted her students. She used her close relationship with them to attempt to bypass the District's instructions and garner their support. She also used her purported visions and religious experience to meddle with her students' personal lives. Defendants legitimately found she crossed ethical and professional boundaries as a result. In sum, because the Court finds that Defendants' policies are job-related and consistent with business necessity, the burden now returns to Plaintiff. *See Yarberry*, 625 F. App'x at 740.

### 3. Pretext

Plaintiff must now prove by a preponderance of the evidence that Defendants' proffered reasons were mere pretext for disability discrimination. *Jones*, 2015 WL 1036382, at *6 (citations omitted). Because Defendants offer multiple reasons for terminating Plaintiff, she must "manage[] to cast substantial doubt on a fair number of them." *Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 801–02 (S.D. Ohio 2013), *aff'd*, 577 F. App'x 544 (6th Cir. 2014). She may do so through three methods of proof.

First, she can offer evidence showing that there is no basis in fact to Defendants' proffered reasons. To succeed, she must establish that the conduct warranting her termination "never happened, i.e., that [it] [is] actually false." *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 751 (6th Cir. 2019). Second, Plaintiff may produce circumstantial evidence showing that Defendants' proffered reasons did not actually motivate their decision to terminate her. *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 656 (6th Cir. 2016). For example, "inconsistent or

22

contradictory statements from [Defendants] could cast doubt on [their] motivation, giving rise to an inference of pretext." *Merendo v. Ohio Gastroenterology Grp., Inc.*, No. 2:17-CV-817, 2019 WL 955132, at *12 (S.D. Ohio Feb. 27, 2019) (citing *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997)). At base, "the sheer weight of [this evidence]" must "make[] it more likely than not" that Defendants' explanation "is a pretext, or a coverup." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004) (quotation marks omitted). Finally, Plaintiff may offer evidence showing that Defendants' proffered reasons were insufficient to warrant her termination. *Hendrick*, 355 F.3d at 460. This "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* (citation omitted).

Regardless of which method Plaintiff uses, a reasonable jury must be able to conclude by a preponderance of the evidence that her disability was a "but for cause" of her termination. In other words, "challenging [Defendants'] proffered reason[s] for her termination" is not enough. *Snyder v. Shelby Cty. Bd. of Educ.*, No. 2:14-CV-02048-DKV, 2015 WL 13022301, at *10 (W.D. Tenn. June 17, 2015), *aff'd*, 647 F. App'x 618 (6th Cir. 2016). She must go a step further and "provide evidence from which the fact finder could conclude that [her] termination . . . was really because of her disability." *Id.* (citing *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 558 (6th Cir. 2014)).

The Court addresses each of Plaintiff's pretext arguments in turn.

i.      Admitted Use of Marijuana

As to Defendants' first proffered explanation, Plaintiff attempts to create a factual discrepancy where there is none. She notes that Defendants' March 13, 2018, pre-disciplinary letter falsely accused her of smoking marijuana "recently" and during the work week." (Doc. 54 at 40). But in terminating Plaintiff, and at summary judgment, Defendants' explanation is not so

narrow—they simply cite her "admitted use of illegal marijuana on various dates during January 2018, and possible earlier dates[.]"  (Doc. 34 at 25).  And Plaintiff admitted at her deposition that she "smoked [marijuana] a couple times" and testified at her public hearing that she used marijuana in June 2017.  So Plaintiff cannot show that there is no basis in fact to Defendants' first explanation.

Next, Plaintiff contends that her seldom use of marijuana does not rise to a terminable offense.  (Doc. 54 at 32).  According to her, the District "would probably have to fire *a lot* of people if the threshold is 'have you ever smoked any marijuana in your lifetime?'"  (*Id.*).  But "[i]t is not enough . . . to disbelieve the employer, the factfinder must believe the plaintiff's explanation of intentional discrimination."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 n.4 (1993).  Plaintiff has presented no evidence that another teacher for the District, particularly one without a disability, used marijuana or other recreational drugs and was not fired as a result.  *See Hendrick*, 355 F.3d at 461.  Her "[m]ere conjecture" regarding the District's stance on marijuana is not enough to show pretext.  *Upshaw v. Ford Motor Corp.*, 576 F.3d 576, 587 (6th Cir. 2009).

ii.     Discussing Religion

Plaintiff makes two arguments regarding Defendants' second reason.  To begin, she contends that she did not violate school policy by sharing her religious beliefs with students.  (Doc. 54 at 33–34).  In support, she relies on handwritten accounts from students who say that she never "preached" religion.  (*Id.* at 33).  But Defendants do not say they terminated Plaintiff because she violated an express provision in the teacher handbook regarding religion.  Rather, they terminated her because she inappropriately discussed her religious experience with students during the instructional day and over email after school.  (*See* Doc. 34 at 27).  And Plaintiff does not deny doing so.  *See Williams*, 790 F. App'x at 751 (noting that, to show an explanation has no basis in fact, the plaintiff must show that the alleged conduct "never happened").  Her first argument fails as a result.

Plaintiff also asserts this reason did not motivate Defendants' decision to fire her.  (Doc.

24

54 at 34).  For evidence, she attempts to create an inconsistency in the timeline.  She emphasizes that Principal Schob did not immediately discipline her after learning about her conduct.  (*Id*.).  So, she says, if Principal Schob was "fine with" her conduct why did it "allegedly le[ad] to her termination[?]"  (*Id*.).  The Court is not convinced.  Plaintiff shared her experience with students beginning on Friday, January 19, 2018, and Principal Schob raised her concerns with Superintendent Hampton the following Monday.  Plaintiff was placed on paid administrative leave the next day.  Given this timeline, Plaintiff has failed to show even a "trivial inconsistency," *Jennings*, 630 F. App'x at 554, let alone evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant," *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (emphasis in original) (quotation marks and citation omitted).  She has failed to prove pretext as a result.

### iii.    Discussing Employment or Termination Proceedings

Plaintiff does not argue Defendants' third reason was pretextual—notably, she does not address it at all.  And the evidence establishes that Plaintiff frequently communicated with students while on administrative leave in violation of the District's orders otherwise.  Accordingly, there is no dispute of material fact with regard to this explanation.

### iv.    Incapable of Performing Essential Duties of Teaching

Plaintiff's final argument is not based on pretext.  It is broader.  She asserts Defendants cannot terminate her for being unfit to teach because they never attempted to accommodate her disability.  (Doc. 54 at 34–36).  In other words, she believes Defendants' conduct constituted per se discrimination.  (*See id*.).  Unfortunately for Plaintiff, and as explained below in Section B, the Sixth Circuit disagrees.

* * *

In sum, Plaintiff has failed to "cast substantial doubt" on any of Defendants' reasons for terminating her.  *Nathan*, 984 F. Supp. 2d at 801–02.  Defendants are, therefore, entitled to

25

summary judgment on her disability discrimination claims (Counts One and Two).

### B. Failure to Accommodate

A failure to accommodate claim is distinct from a disability discrimination claim, in part, because it requires direct evidence of discrimination. *Belasco*, 634 F. App'x at 514 (citing *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007); *Shaver v. Wolske & Blue*, 742 N.E.2d 164, 171–72 (Ohio Ct. App. 2000)). As part of her prima facie case, Plaintiff must show that she requested an objectively reasonable accommodation and that Defendants refused to make it. *Johnson v. Cleveland City Sch. Dist.*, No. 1:07 CV 1610, 2010 WL 522804, at *4 (N.D. Ohio Feb. 5, 2010), *aff'd*, 443 F. App'x 974 (6th Cir. 2011) (citing 29 C.F.R. § 1630.9(d)).

Defendants argue that Plaintiff's claim fails at the outset because she never requested an accommodation. (Doc. 34 at 23–25). Plaintiff responds with alternative arguments. First, she says she was not required to request an accommodation because her disability was obvious to Defendants. (Doc. 54 at 23–25). But even if she was required to request an accommodation, she "raised the issue of Marietta Schools not accommodating her" at the April 5, 2018, Board meeting. (*Id*. at 26).

For Plaintiff to succeed on either theory, she "must present evidence to show that some type of accommodation was possible." *Moloney v. Home Depot U.S.A., Inc.*, No. 11-10924, 2012 WL 1957627, at *15 (E.D. Mich. May 31, 2012); *see also Deister*, 91 F. Supp. 3d at 928 (collecting cases) ("[T]he Sixth Circuit has indicated that an employer is not liable for failing to engage in the interactive process unless the plaintiff can show that a reasonable accommodation was possible."). Yet Plaintiff never proposed a reasonable accommodation to the District, and she does not propose one now. So there is no evidence that Defendants could have accommodated her. She cannot succeed on this claim as a result. *See Deister*, 2015 WL 1005408, at *21 ("Deister has not met his burden to propose an objectively reasonable accommodation and show that it was possible.").

Briefly, Plaintiff's failure to accommodate claim suffers from another fatal flaw. Even if

26

Plaintiff requested a reasonable accommodation at the April 5, 2018, Board meeting and produced evidence that the accommodation was possible, her request came too late. As explained, Defendants were permitted to terminate Plaintiff for conduct caused or exacerbated by her disability. *See Yarberry*, 625 F. App'x at 742. In such a situation, "the ADA [does] not require further discussion about the employee's disability or request for reasonable accommodation." *Id.* (quotation marks and citation omitted).

*Yarberry*, again, provides a good example. After Hhgregg terminated him, the plaintiff was involuntarily committed to a psychiatric unit. *Id.* He subsequently requested time off due to his hospitalization. *Id.* But, as is the case here, his request was untimely. "Had Yarberry not already engaged in misconduct meriting termination, it is possible that his requests for time off due to his hospitalization might have been timely and Hhgregg would have been obliged to try to accommodate him." *Id.* But "because Yarberry had already committed the misconduct that Hhgregg cited as the reason for his termination, Hhgregg was not obligated to rescind Yarberry's termination or engage in further discussion of his requests for accommodation." *Id.*

The same is true here. The timing of Plaintiff's request "is crucial." *Id.* By the time she raised the issue of an accommodation at the April 5 Board meeting, Plaintiff "had already committed the misconduct that [Defendants] cited as the reason for [her] termination[.]" *Id.* Defendants, therefore, were "not obligated" to forego her termination proceedings "or engage in further discussion of [her] requests for accommodation." *Id.* For this additional reason, Defendants are entitled to summary judgment on Plaintiff's failure to accommodate claim.

### C. Retaliation and Religious Discrimination (Counts Three and Four)

In her remaining two claims, Plaintiff alleges that Defendants violated Ohio law. Because Plaintiff's federal claims have been dismissed, "it remains within [the Court's] discretion whether to continue to exercise supplemental jurisdiction over remaining state law claims that arise from the same nucleus of operative facts[.]" *Simuel v. City of Dayton*, No. 3:09CV180, 2011 WL

4102529, at *8 (S.D. Ohio Sept. 14, 2011) (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991)).  In exercising this discretion, "the Court must balance concerns of federalism and comity, on the one hand, generally weighing against unnecessary federal court decisions addressing state law, and the common sense policies of judicial economy and fairness on the other."  *Simuel*, 2011 WL 4102529, at * 8 (citing *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010)).

Ohio religious discrimination and retaliation claims have the same evidentiary standards and general analysis as its federal counterparts.  *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (collecting cases); *Gibbons v. Bair Found., Inc.*, No. 104CV2018, 2007 WL 582314, at *5 (N.D. Ohio Feb. 20, 2007).  As such, the interests of judicial economy and fairness weigh in favor of exercising supplemental jurisdiction here.

Plaintiff alleges that Defendants discriminated against her on the basis of religion.  (Doc. 54 at 37).  She also alleges that Defendants fired her in retaliation for her statements at the April 5 Board meeting.  (Doc. 54 at 40–41).  As Plaintiff notes, Defendants do not challenge Plaintiff's prima facie case for either claim.  (*See generally* Doc. 34).  Rather, they move straight to their burden to produce legitimate, nondiscriminatory or nonretaliatory reasons for terminating her.  (*See, e.g.*, Doc. 34 at 19 ("Plaintiff was not discriminated against nor retaliated against because of a disability . . . Plaintiff's termination was based upon her no longer being capable of performing the essential functions of her position . . .")).

Because the Court has concluded that Defendants have satisfied their burden, Plaintiff now shoulders the burden to prove pretext.  *See Braun*, 828 F.3d at 511.  She relies on the same arguments and evidence of pretext as she does for her disability discrimination claims.  (Doc. 54 at 41).  But the Court has already rejected those arguments and found that Plaintiff has failed to prove pretext by a preponderance of the evidence.  Because she relies on no other evidence of pretext, Plaintiff's religious discrimination and retaliation claims fail for the same reasons as her

28

disability discrimination claims.  Defendants are entitled to summary judgment on these claims as a result.

Finally, Defendants seek to file a sur-reply in support of their summary judgment motion. (Doc. 67).  Specifically, they ask to supplement their motion "with the newly obtained deposition testimony" from supervised psychologist Amber Davis.  (*Id*.).  But Ms. Davis's deposition transcripts are already a part of the record, and the Court finds that a sur-reply would be superfluous as a result.  Defendants' Motion (Doc. 67) is **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 34) is **GRANTED**.  Defendants' Motion for Leave to File Supplemental Reply (Doc. 67) is **DENIED**.

IT IS SO ORDERED.


Date:  November 18, 2020                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE

29